# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. GLR-17-631** |
| **NGHIA PHO,** | |
| **Defendant** | |

## RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SENTENCING REDUCTION

The defendant has filed a motion for release under 18 U.S.C. § 3582(c)(1)(A)(i).  The motion should be denied because no extraordinary and compelling reasons merit the relief requested, and the 18 U.S.C. § 3553(a) factors counsel against any such modification.

### Background

On November 29, 2017, the United States Attorney for the District of Maryland filed an Information charging the defendant with willful retention of national defense information, in violation of 18 U.S.C. §  793(e).  *See* ECF No. 1.  On December 1, 2017, pursuant to an agreement with the Government, the defendant pleaded guilty to the Information.  *See* ECF No. 9.  In the Statement of Facts appended to the plea agreement, the defendant admitted that, for a period of approximately <u>five years</u>, the defendant unlawfully took Top Secret and other classified information from the National Security Agency ("NSA"), in hard copy and digital form.  *Id.* at 11-13.

The Government filed an unclassified sentencing memorandum, ECF No. 20, as well as a classified sentencing memorandum that more fully describes the scope of the defendant's conduct.  Moreover, appended to the unclassified memorandum was an extensive victim impact statement from the Director of the National Security Agency.  ECF No. 20-1.

On September 25, 2018, this Court heard arguments in classified and unclassified proceedings.  The Court then sentenced the defendant to 66 months of imprisonment, which was below the advisory Guideline range of 78 to 97 months.  *See* ECF No. 30.  The defendant self-reported to the Bureau of Prisons on January 7, 2019, and is incarcerated at FCI Butner Low.

On or about April 15, 2020, the Warden of FCI Butner Low received from the defendant a request for compassionate release predicated on the defendant's belief that he met the criteria for "Elderly with Medical Conditions."  *See* Memo, Ex. 2.  On April 17, 2020, the Warden denied the request, noting among other things that "[a]lthough you have medical conditions[,] you are medically stable and independent in your activities of daily living."  *Id.*[1]  The defendant appears not to have resorted to an administrative appeal of the denial.

Thereafter, on June 10, 2020, having served only 17 months of his term of imprisonment, the defendant filed a motion for compassionate release under 18 U.S.C. § 3582(c).[2]  The defendant seeks release becaus ███████████████████████████ and "is 70 years old ███████████ ████████████████████████████████████████████████████"  Memo at 1.  The defendant's motion is without merit and should be denied.

## **Legal Framework**

The federal sentencing statute provides that an inmate cannot move for compassionate release until he has exhausted administrative remedies with the BOP or by showing that the BOP

---

[1] The defendant's medical records confirm that the medical unit reported that the defendant was "stable and independent in activities of daily living" at the time of the denial.  **Exhibit A** at 3.

[2] The defendant mistakenly claims that he is to be released, assuming good time credits, on September 13, 2022.  Memo at 2.  In fact, according to the source cited in the defendant's brief and other documentation from BOP, the defendant is to be released no earlier than September 13, **2023**, a full year later.  Thus, the defendant seeks to cut short his prison term by at least three full years, even assuming good conduct.

failed to respond to his request within 30 days.[3]  Once the inmate exhausts administrative remedies and confers authority on the Court to rule on his motion, the Court can only reduce the inmate's sentence upon a showing of "extraordinary and compelling reasons" warranting the reduction, that the inmate is no longer a danger to the community, and that the reduction would be consistent with the relevant Sentencing Commission policy statement and 18 U.S.C. § 3553(a) factors. The following sections explain this legal framework in detail.

### I.        Court's authority to adjudicate motions for compassionate release.

Under 18 U.S.C. § 3582(b), the district court has limited authority to modify a final sentence.  *See United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010); *Dillon v. United States*, 560 U.S. 817, 824-25 (2010) (noting that under Section 3582, the Court generally "may not modify a term of imprisonment once it has been imposed"); *United States v. Bro*wn, RDB-16-553, at 2 (D. Md. Mar. 26, 2020) (holding that the Court "may not modify the sentence imposed . . . unless certain limited circumstances arise or as permitted under Rule 35 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582(c)").

As amended by the First Step Act, Section 3582(c)(1) permits the Court to reduce the inmate's term of imprisonment provided that the inmate has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or the inmate shows "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A); *United States v. Nance*, 2020 WL 114195, at *2 (W.D. Va. Jan. 10, 2020).  Since the outbreak of COVID-19, federal courts—including this one—

---

[3] For the purpose of this opposition, the Government uses the term "exhaustion" to include the scenario where the BOP does not respond within 30 days of the inmate's request for compassionate release.

have overwhelmingly maintained that exhaustion remains mandatory before the Court may entertain a compassionate release request.  *See United States v. Underwood*, TDC-18-201 (D. Md. Apr. 10, 2020), ECF No. 185 at 3 ("[T]he Court finds no basis to waive the requirement.").  Absent exhaustion, the Court does not have authority to grant the requested relief.

## II.      Grounds for compassionate release.

Once the inmate satisfies the statute's exhaustion requirement, the Court may reduce the inmate's sentence, but only if it finds that the inmate is eligible for compassionate release—that "extraordinary and compelling reasons warrant such a reduction," and that the inmate is no longer a danger to the community.  18 U.S.C. § 3582(c)(1)(A); *Dillon*, 560 U.S. at 826-27 (holding that Section 3582(c) permits a sentencing reduction only when that reduction would be "consistent with applicable policy statements issued by the Sentencing Commission") (citing U.S.S.G. § 1B1.10 (policy statement for Section 3582(c)(2) sentencing reductions)).

Application Note 1 to Section 1B1.13—the relevant Sentencing Commission policy statement—defines the "extraordinary and compelling reasons" that make an inmate eligible for compassionate release. 28 U.S.C. § 994(t) (providing that the Sentencing Commission's policy statement describes "what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"); *Dillon*, 560 U.S. at 826-27 (holding that the Sentencing Commission's policy statement is binding on the Court).  The Government acknowledges that district court judges in the District of Maryland have found the Guideline statements not to be binding.  *See United States v. Mel*, 2020 WL 2041674, at *3 (D. Md.); *United States v. Wright*, TDC-17-388, ECF No. 51, at 5; *United States v. Gallman*, PWG-14-292, ECF No. 197.  Nonetheless, consistent with guidance, the Government maintains that Application Note 1 to Section 1B1.13 defines the "extraordinary and compelling reasons" that make an inmate eligible for compassionate release.

Relevant to this case, the § 1B1.13 reasons include:

- a terminal illness,

- a serious medical condition "that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," or

- a "defendant who is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process," and "has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less."

U.S.S.G. § 1B1.13 cmt. n.1 (other grounds omitted).

If the Court determines that the inmate is eligible for a sentencing reduction (that is, that "exceptional and compelling reasons" exist <u>and</u> the defendant is not a danger to the community), the Court considers the Section 3553(a) factors and determines whether to exercise its discretion to reduce the inmate's sentence. *Dillon,* 560 U.S. at 827.

The burden is on the inmate to demonstrate that he has exhausted administrative remedies, that there are extraordinary and compelling reasons to reduce his sentence, and that he is not a danger to the community.   18 U.S.C. § 3582(c)(1)(A); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility).   Even for those inmates who are statutorily eligible for a reduced sentence, compassionate release is a "rare" and "extraordinary" remedy.   *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).

## **<u>BOP Response to COVID-19</u>**

The BOP has taken aggressive action to mitigate the danger of COVID-19.   In early 2020, the agency established a COVID-19 working group to develop responsive procedures in

consultation with experts from the Centers for Disease Control ("CDC"). On March 13, 2020, the

agency implemented the COVID 19 Phase Two Action Plan ("action plan") in order to minimize

the risk of COVID-19 transmission into its facilities. The action plan comprises several preventive

and mitigation measures, including the following:

> **Screening of Inmates and Staff:** All new BOP inmates are screened for COVID-19 symptoms and risk of exposure. Asymptomatic inmates with a documented risk of exposure will be quarantined, and symptomatic inmates with documented risk of exposure will be isolated and tested pursuant to local health authority protocols. In areas with sustained community transmission, all facility staff will be screened for self-reported risk factors and elevated temperatures. Staff registering a temperature of 100.4 degrees or higher will be barred from the facility on that basis alone.

> **Contractor Access:** Contractor access to BOP facilities is restricted to only those performing essential services (including medical or mental health care) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization from the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened using the same procedures as applied to staff prior to entry.

> **Quarantine Logistics:** The action plan directs all BOP institutions to assess their stockpiles of food, medicines, and sanitation supplies and to establish quarantine areas within their facilities to house any detainees who are found to be infected with or at heightened risk of being infected with coronavirus pursuant to the screening protocol.

> **Suspension of Social Visits and Tours:** BOP has placed a 30-day hold on all social visits, such as visits from friends and family, to limit the number of people entering the facility and interacting with detainees. In order to ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended for at least the first 30 days that the action plan is in effect.

> **Suspension of Legal Visits:** BOP has placed a 30-day hold on legal visits, though such visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

> **Suspension of Inmate Movements:** BOP has also ceased the movement of inmates and detainees among its facilities for at least the first 30 days that the action plan is in effect. Though there will be exceptions for medical treatment and other exigencies, this will

prevent transmissions between institutional populations. Likewise, all official staff travel has been cancelled, as has most staff training.[4]

**Modified Operations:** Finally, the action plan requires wardens at BOP facilities to modify operations in order to maximize social distancing.[5]

The BOP has since instituted additional phases of its action plan in order to amplify measures to help prevent the spread of COVID-19.  For example, as of April 1, 2020, BOP "made the decision that all inmates, in every institution, will be secured in their assigned cells/quarters in order to decrease the spread of the virus. . . .  These actions will remain in place until May 18, 2020, at which time they will be reevaluated." https://www.bop.gov/resources/news/pdfs/ 202004211_memo_to_inmate_families_and_friends.pdf.  At the same time, BOP began feeding all inmates in their units.  *Id.*

The measures enumerated in BOP's plans are designed to sharply mitigate the risk of COVID-19 transmission into BOP facilities. As communicated to the Government, BOP professionals will continue to monitor the path of the virus and adjust its practices as necessary to maintain the safety of BOP inmates.  *See Raia*, No. 20-1033, at 8 (Third Circuit taking note of the "BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

## Argument

### I.    The Court Has The Authority to Rule on the Motion.

A court may only consider a prisoner's motion for compassionate release if he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion

---

[4] On May 25, 2020, BOP announced that it would begin processing all newly-sentenced BOP inmates through one of three quarantine sites, at FCC Yazoo City, Mississippi; FCC Victorville, California; and FTC Oklahoma City, Oklahoma.

[5] Further details are available at www.bop.gov/resources/news/20200313_covid-19.jsp, and at the regularly updated resource page, www.bop.gov/coronavirus/index.jsp.

on the defendant's behalf" or if thirty days have passed since the Warden of the defendant's facility received such a request.  *See* 18 U.S.C. § 3582(c)(1)(A).  This condition is satisfied.  The warden of the BOP facility received the defendant's request on or about April 15, 2020, and more than thirty days have since lapsed.

**II.       The Defendant Has Not Shown Extraordinary and Compelling Reasons.**

The defendant has not met his burden of showing extraordinary and compelling reasons that would make him eligible for relief.  Therefore, his motion should be denied.

The defendant claims that he has met his burden of showing "extraordinary and compelling reasons" because he ████████████████████████ is almost 70 years old, ██████████ ████████████████████████████████████ Memo at 1.  None of these issues, individually or collectively, amount to "extraordinary and compelling reasons."

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- The defendant is 69 years old.  He fails to explain how this quite common characteristic is so extraordinary as to warrant the Court relieving him of his term of imprisonment.  With respect to age, ██████████████████████████ ██████████ the defendant's argument appears to conflate correlation with causation.

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████



The defendant does not allege that any of his claimed conditions have compromised his immune system in any way.  Nor do the defendant's medical records suggest that his immune system is in any way compromised.

In sum, none of the defendant's claimed conditions is sufficient to rise to the level of extraordinary and compelling reasons to modify his term of imprisonment.  In comparison to the categories referenced in Application Note 1 to § 1B1.13, the defendant is not terminally ill.  He is not suffering from a serious medical condition that substantially diminishes his ability to provide self-care in facility and from which he is not expected to recover.  And though he is at least 65 years old, he is not "experiencing a serious deterioration in physical or mental health because of the aging process" and has not served 75 percent of his 66-month term of imprisonment.  He simply is not eligible for compassionate release under Section 1B1.13.  *See United States v. Goode*, 2020 WL 58272, at *6 (S.D.N.Y. Jan. 6, 2020) (denying compassionate release motion because defendant failed to show that her "end stage kidney disease" had an "end of life trajectory" and otherwise met the criteria for compassionate release based on her medical condition); *United States v. Heromin*, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019) (concluding that defendant had failed to demonstrate "a foundation for compassionate release based on his medical condition" because his medical provider did not indicate that defendant's medical conditions were either terminal or resulted in an inability "to provide self-care within the correctional facility").

The defendant's medical records from his entire time in BOP custody are attached as **Exhibit A**, **Exhibit B**, and **Exhibit C**.  The most striking aspect of his medical records is how routine they are, not only compared to other inmates for whom this Court has assessed § 3582 motions but also pre-trial detainees in local detention facilities.  If the conditions the defendant claims to have and to be so serious do not necessitate routine interaction with medical staff, it is hard to conceive how he meets the criteria for compassionate release.



Though FCI Butner Low reported and continues to report a large number of positive cases, the percentage of inmates testing positive is similar to the situation at a nearby facility, the camp at FCI Butner I, where mass testing occurred in late April 2020.  The course of events at FCI Butner I is important to the Court's consideration.  When testing at the camp occurred on or about April 23, 2020, approximately 210 of the approximately 260 inmates—that is, 80%—at the camp

[9] The number of positive inmates at FCI Butner Low likely will dramatically lower in the coming days, as more time passes from the initial positive diagnoses.  Inmates continue to be listed as positive until being asymptomatic for 14 days after a positive test, and then testing negative on two tests administered at least 24 hours apart.

tested positive.  By May 9, FCI Butner Medium I (of which the camp is a part) had 224 active COVID-19 cases (211 inmates, 13 staff) and seven deaths.  By May 19, the facility had only 57 positive inmates, 6 positive staff, 8 deaths, 168 recovered inmates, and 20 recovered staff.  By June 9, the facility had 28 positive inmates, 5 positive staff, 9 inmate deaths, 194 inmates recovered, and 24 staff recovered.  As of today, June 23, FCI Butner Medium I has only 18 positive inmates and 3 positive staff.  Thus, roughly 90% of the inmates at FCI Butner Medium I have recovered.

Even when the conditions at FCI Butner Medium I appeared most dire, district courts assessed the individual circumstances of defendant's seeking compassionate release, and on many occasions denied release.  *See United States v. Johnson*, 2020 WL 2573239 (C.D. Ill. May 21, 2020) (denying compassionate release to inmate at FCI Medium I); *United States v. Nieves*, 2020 WL 2476185 (S.D.N.Y. May 13, 2020) (same); *United States v. Mazur*, 2020 WL 2113613 (E.D. La. May 4, 2020) (same).  And just yesterday, this Court denied relief for an inmate at FCI Butner Medium I, even though in that case the Government conceded that the defendant's medical conditions met the exceptional and compelling circumstances requirement.  *See United States v. Gallman*, PWG-14-292, ECF No. 197.

Accordingly, the Court should deny the defendant's motion for compassionate release on the basis that it fails to adequately set forth an "extraordinary and compelling reason" for relief.

### III.    The § 3553(a) Factors Do Not Support Release.

Even if the defendant shows extraordinary and compelling reasons for a modification, then under § 3582(c)(1)(A) the Court still must assess the 18 U.S.C. § 3553(a) factors to determine

whether a modified term of imprisonment is appropriate.[10]  Here, the § 3553(a) factors strongly counsel against granting the defendant's motion.

### A.        Nature and Circumstances of the Offense

In the Statement of Facts appended to his plea agreement, the defendant admitted to a lengthy history of compromising some of the nation's most closely held types of intelligence.  *See* ECF No. 9.  For a period of at least *five years*, the defendant removed Top Secret and Sensitive Compartmented Information ("SCI")[11] from secure space at the NSA and retained it in his home— an unsecure residence.   As further explained in the Government's classified sentencing memorandum, the defendant's criminal conduct demonstrated an extraordinary disrespect for national security.   The Government assumes the Court's familiarity with the classified memorandum, and can arrange for the Court to review a copy should it so desire.

### B.        History and Characteristics of the Defendant

The defendant's history and characteristics also continue to mandate the 66-month term of imprisonment this Court imposed.  Though the defendant had no prior criminal history and now seeks to live with his family, the Court considered and rejected each of those bases during the sentencing hearing in which the defendant asked for no jail time.  *See* ECF No. 19 at 3-5 (defense

---

[10] The Court also needs to determine, as a threshold matter, whether the defendant is a danger to the community.  Here, the Government concedes that the defendant does not represent such a danger, since he no longer has access to classified material.

[11] By definition, information may be classified as "TOP SECRET" only if its unauthorized disclosure reasonably could be expected to cause exceptionally grave damage to the national security.  Exec. Order 13526 § 1.2.  Access to SCI is further restricted.  SCI is a type of classified information concerning or derived from sensitive intelligence sources, methods, or analytical processes.  SCI must be handled within formal access control systems established by the Director of National Intelligence.  One must receive explicit permission to access an SCI control system or compartment.  Once it is determined a person should have access to an SCI compartment, that person signs a nondisclosure agreement specific to that compartment.

sentencing memo discussing family and children as reasons he should not receive a sentence of incarceration). All of those positive aspects of the defendant's life were present when the defendant committed his extensive and time-consuming criminal conduct. Not one of the positive aspects of his life prevented him from removing classified information from secure space and retaining it in an unsecure location. And not one of them should prevent him from continuing to serve his appropriately lengthy term of imprisonment.[12]

### C. The Need for the Sentence Imposed to Provide for Adequate Deterrence, Promote Respect for the Law, and Provide Just Punishment.

The offense was exceptionally serious and caused damage to national security. To underscore the seriousness of the defendant's offense, the then-Director of the National Security Agency authored a victim impact letter. *See* ECF No. 20-1. According to Admiral Rogers:

> Mr. Pho's conduct in improperly and unlawfully retaining national defense information, which included highly classified information, outside of secure space had significant negative impacts on the NSA mission, the NSA workforce, and the Intelligence Community as a whole. By taking highly classified material outside of the controlled space of NSA, Mr. Pho placed at risk some of NSA's most sophisticated, hard to achieve and important techniques of collecting from sophisticated targets of the NSA, including collection that is crucial to decision makers when answering some of the Nation's highest-priority questions.

---

[12] It is also noteworthy that, given the defendant's long history of government employment, and the numerous non-disclosure agreements signed by the defendant, the defendant clearly understood the trust the United States places in individuals who receive a security clearance. The defendant blatantly violated this trust. Since the defendant could not abide by mandatory laws regarding classified material before, the Court should not entrust the defendant now to adhere to voluntary social distancing guidelines that are so necessary to protect not only his own health, but the health of the community. *Cf. United States v. Chase*, JKB-19-473, ECF No. 34 (May 11, 2020) (denying pre-sentencing release motion and stating, "However, the success of Chase's proposed release plan would be contingent upon Chase strictly following any quarantine instructions and relevant state policies following his release. Chase has violated the terms of his probation in the past is a repeat offender. The Court is skeptical that Chase would abide by such rules given his history of noncompliance.").

Because the NSA deals with significant collection tools that are subject to compromise, the NSA has a responsibility to assume that classified information removed from secure space has been compromised, sometimes invariably so.  According to Admiral Rogers:

> By removing such highly classified materials outside of secure space, Mr. Pho subjected those materials to compromise.  It is a fundamental mandate in the Intelligence Community that classified material must be handled and stored in very specific and controlled ways.  If classified material is not handled or stored according to strict rules, then the government cannot be certain that it remains secret.  Once the government loses positive control over classified material, the government must often treat the material as compromised and take remedial actions as dictated by the particular circumstances.  Depending on the type and volume of compromised classified material, such reactions can be costly, time consuming and cause a shift in or abandonment of programs.

Here, the defendant took, as noted by Admiral Rogers, "a tremendous volume of highly classified, sophisticated collection tools" from secure space and retained it in unsecure space.  As a result, NSA was forced to abandon certain important initiatives, at the cost of the nation's security.

The defendant's substantial criminal conduct merited substantial punishment, which the Court properly imposed.  And the Court, sitting in the District that houses the NSA, should consider the need to deter others tempted to compromise classified information.  If the Court releases the defendant after he has served only 17 months of imprisonment, other would-be criminals will take note.  It would be an encouragement, not a warning, to those tempted to mishandle classified information, or to disclose classified information without authorization.  Those bad actors would know that few consequences will come from their conduct, no matter how much the offense harms our country's security, including disruption to the offensive collection of adversary information or the defensive protection of the intelligence community's sources and methods.

Similarly, releasing the defendant now would do nothing to promote respect for the law. Home confinement in ordinary times is not the same as custody in facility.  It is even more lax now, given that U.S. Probation—which would be tasked with monitoring the defendant—is not currently equipped with the tools to enforce a strict home confinement.

### Conclusion

Despite the defendant's failure to show "extraordinary and compelling reasons" and his failure to demonstrate that a reduction is warranted under the § 3553(a) factors, the defendant asks the Court to exercise authority to provide him with an undeserved windfall.  The Court should reject the defendant's motion.

Respectfully submitted.

Robert K. Hur
United States Attorney

/s/Thomas P. Windom
Thomas P. Windom
Assistant United States Attorney